IN RE INTEREST OF FLOYD B., JR., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. FLOYD B., SR., APPELLANT, AND BEVERLY B., ALSO KNOWN AS ROCHELLE B., APPELLEE.

577 N.W. 2d 535

Filed April 10, 1998. No. S-97-059.

Milo Alexander, of Legal Aid Society, Inc., for appellant.

James S. Jansen, Douglas County Attorney, and Karen S. Kassebaum for appellee State.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

GERRARD, J.

On December 11, 1996, the State of Nebraska filed an amended petition under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993), alleging that Floyd B., Sr. (father), on November 26 subjected his son Floyd B., Jr. (Floyd), to inappropriate physical discipline resulting in a black eye, a cut on his tongue, and bruises on his inner thigh. The amended petition requested that the court enter an order regarding the custody and support of Floyd that the court deemed most appropriate. In response to the State's petition, the father filed a motion to dismiss, contending that pursuant to the Nebraska Child Custody Jurisdiction Act (NCCJA), Neb. Rev. Stat. §§ 43-1201 through 43-1225 (Reissue 1993, Cum. Supp. 1994 & Supp. 1995), the court lacked subject matter jurisdiction, and that even if the court had jurisdiction, the court should decline to exercise jurisdiction because Nebraska was an inconvenient forum for the proceedings. Further, the father requested that the court release Floyd to the custody of his mother, Beverly B., also known as Rochelle B. After a hearing on December 16, in which evidence was adduced, the separate juvenile court of Douglas County entered an order on December 18, finding that it would be contrary to the best interests of Floyd if he were released into the custody of either parent and mandating that Floyd be placed in the temporary custody of the then Department of Social Services, now the Department of Health and Human Services (department), until further order of the court. Because the juvenile court properly exercised emergency jurisdiction over Floyd and because Nebraska was a convenient forum for the emergency proceedings, we affirm the order of the juvenile court.

## I. FACTUAL BACKGROUND

The father and the mother are married, but at the time of the emergency proceedings, they lived in different states. Their plans are apparently to reunite at some time in the future. The father and the mother have three children: Floyd, M.B., and C.B. The mother resides in Colorado with M.B. and C.B., while the father resides in Alabama with his 12-year-old son Floyd. Because the father and mother are not divorced, Floyd has not been the subject of any custody proceedings.

The father and Floyd resided with the mother in Tacoma, Washington, between October 1989 and April 1992. In April 1992, Floyd moved with his father and mother to Denver, Colorado, where he remained until August 1995. In August 1995, Floyd moved to Mobile, Alabama, to live with his father. On November 27, 1996, the father and Floyd traveled to Nebraska for the Thanksgiving holiday. While in Nebraska, family members of the father's and Floyd's noticed bruising on Floyd, became concerned, and contacted the Omaha Police Division. Subsequently, Floyd was placed in protective custody with the department.

On December 11, 1996, the State filed an amended petition under § 43-247(3)(a), alleging that the father, on November 26, subjected Floyd to inappropriate physical discipline resulting in a black eye, a cut on his tongue, and bruises on his inner thigh. The amended petition requested that the juvenile court enter an order regarding the custody and support of Floyd that the court deemed most appropriate. In response to the State's petition, the father filed a motion to dismiss, contending that the court lacked subject matter jurisdiction under the NCCJA and that even if the court had jurisdiction, the court should decline to exercise jurisdiction because under the NCCJA, Nebraska was an inconvenient forum for the proceedings. Furthermore, the father requested that the court release Floyd to the custody of the mother.

At the detention hearing on December 16, Shirley King, a Child Protective Services worker, testified that she observed the following:

The child had bruising to his upper eyelid — right eyelid, which appeared to be approximately a week old. The child

indicated to me that he had a bruise on his left inner thigh which I asked him to show me — [t]he bruise was very large in nature. I would have to say it was at least the size of an apple — where he had indicated to me that his father had kicked him. And he also had a mark on the end of his tongue where he indicated that he had come down and had bit his tongue when his father had hit him in the face.

Floyd indicated to King that the injuries occurred on November 26, after the father discovered that Floyd had altered his report card. Floyd also told King that his father hits him on almost a daily basis and that he has been hit with belts, boat paddles, and extension cords. Floyd told King that he would visit his mother but was afraid to live with her as his mother planned on reuniting with his father.

In addition, King testified that she contacted Mattie Bettis, a counselor from Floyd's school in Alabama, who indicated that the school had been concerned about Floyd for 2 years and that the school had contacted the Alabama Department of Social Services about those concerns. King contacted the Alabama Department of Social Services, but it indicated there was no record of an investigation. However, the mother testified that she was contacted by the Alabama Department of Social Services, and the father also admitted to an investigation in Alabama. King also contacted the Colorado Department of Social Services, which had received three referrals in a 3- to 4-month timeframe concerning the physical abuse of Floyd by his father. Finally, King testified that in her opinion, Floyd was "at [a] very high risk for future maltreatment if returned to either parent at this time."

Marilyn Phelps, the father's sister and Floyd's aunt, testified that the mother informed her that Floyd and his father were on their way to Omaha and requested that Phelps check Floyd for bruises upon their arrival. Phelps testified that upon their arrival, she did observe a bruise on Floyd's eyelid. Phelps stated that the mother has told her on several occasions that she was afraid Floyd was being physically abused by his father. However, the mother, in her testimony, denied calling Phelps and asking her to check Floyd for bruises.

The mother testified that she was not convinced Floyd was physically abused, because she had not observed any injuries on Floyd and because she had the father's "word." The mother testified that until she observes injuries, she has no basis for concluding that Floyd has been physically abused. The mother further testified that Floyd had never told her about any abuse by his father, nor had he told her that he was afraid of his father. The mother testified that if Floyd were placed in her custody, she would keep him away from the father if directed to do so by the court and would allow supervision by the Colorado Department of Social Services.

The father testified that he has never placed his hands on Floyd and that Floyd did not have any bruises on him when the father last saw him, which was prior to Floyd's being placed into protective custody. The father further testified that Floyd had run away from home while in Alabama and had told police that he was being physically abused. Floyd was returned home after a 2-day investigation. Lawrence Coran, who grew up with the father, testified that he saw the father and Floyd on November 28, 1996, and that he did not observe any bruises on Floyd's face.

After the hearing, the juvenile court, on December 18, 1996, entered an order finding that it would be contrary to the best interests of Floyd if he were placed in the custody of either parent and mandating that Floyd be placed in the temporary custody of the department until further order of the court. The father appeals.

## II. SCOPE OF REVIEW

When a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from that of the trial court. *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996). However, when the determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994).

The question as to whether jurisdiction existing under the NCCJA should be exercised is entrusted to the discretion of the trial court and is reviewed de novo on the record. As in other matters entrusted to a trial judge's discretion, absent an abuse of discretion, the decision will be upheld on appeal. *Id.*

## III. ASSIGNMENTS OF ERROR

On appeal, the father's six assignments of error can be consolidated into the following: (1) The juvenile court lacked subject matter jurisdiction under the NCCJA; (2) even if the court had jurisdiction, the court should have declined to exercise jurisdiction because under the NCCJA, Nebraska was an inconvenient forum for the proceedings; (3) the court erred in sustaining relevance objections to questions regarding the parents' financial condition, as such testimony was relevant to determine whether Nebraska was an inconvenient forum; and (4) the court erred in overruling foundation and relevance objections to questions regarding the father's alleged prison record and alleged past incidents of child abuse.

## IV. ANALYSIS

Before addressing the merits, it is incumbent on this court to determine whether the December 18, 1996, order of the juvenile court is a final, appealable order. A detention order issued under § 43-247(3)(a) after a hearing which continues to withhold the custody of a juvenile from the parent pending an adjudication hearing to determine whether the juvenile is neglected is a final order and thus appealable. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997); *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991). Therefore, clearly, the December 18 detention order issued under § 43-247(3)(a) after a hearing which continues to withhold Floyd from the custody of his parents pending a further hearing to determine whether Floyd is abused is a final, appealable order. Accordingly, this court has jurisdiction to address the father's assignments of error.

### 1. PROCEDURAL IRREGULARITY

In response to the State's petition, the father filed a motion requesting the court to "dismiss th[e] case for lack of jurisdic-

tion pursuant to [the] Nebraska Child Custody Jurisdiction Act." While a court's jurisdiction over the subject matter may and should be questioned early in the proceedings by a demurrer, Neb. Rev. Stat. § 25-806 (Reissue 1995); *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993), a jurisdictional question is not properly raised by a pretrial motion to dismiss, as such pleading is not a part of this state's procedure, *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994); *Pappas v. Sommer*, 240 Neb. 609, 483 N.W.2d 146 (1992); *Cool v. Sahling Trucks, Inc.*, 237 Neb. 312, 466 N.W.2d 71 (1991); *United States Fire Ins. Co. v. Affiliated FM Ins. Co.*, 225 Neb. 218, 403 N.W.2d 383 (1987); Neb. Rev. Stat. § 25-803 (Reissue 1995). Nonetheless, despite the father's procedural irregularity, the fact is that the absence of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *State ex rel. Grape v. Zach, supra* (citing *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991)). Thus, it is appropriate for this court to address whether the juvenile court had jurisdiction over the action.

## 2. JURISDICTION

The NCCJA gives jurisdiction to the juvenile court over custody proceedings, including dependency proceedings. *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). "Custody proceeding," as used in the NCCJA, includes proceedings in a juvenile court in which a person under 18 years of age is alleged to be a child as described in § 43-247(3). § 43-1202(3)(b). Because the State filed its petition alleging that 12-year-old Floyd "comes within the meaning of . . . Section 43-247(3a)" and because the State asked the court to make an order regarding the custody of Floyd, the juvenile court was clearly involved in a custody proceeding, and thus, the NCCJA applies in the instant case.

However, the State contends that the provisions of the NCCJA cannot be invoked in the case at bar because no jurisdictional conflict exists with another state. While it is true that no other state has exercised jurisdiction over Floyd in a custody proceeding, the NCCJA, nevertheless, still applies. In *In re*

*Gloria F.*, 212 Cal. App. 3d 576, 260 Cal. Rptr. 706 (1989), the San Diego Department of Social Services argued that the provisions of the Uniform Child Custody Jurisdiction Act (Uniform Act) did not apply to the custody proceeding that was at bar because no jurisdictional conflict existed with another state. The California Court of Appeals, in rejecting the argument, reasoned that

> [n]othing in [the purposes section of the Uniform Act] indicates the act and its jurisdictional requirements apply only when a present conflict exists, i.e., when custody actions are proceeding in the courts of more than one state. Indeed section 5150, subdivision (1)(c), states that one of the purposes of the act is to "[a]ssure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state." Thus the act is not meant merely to mediate jurisdictional disputes but to direct litigation to the state best able to resolve it.

*Id.* at 583, 260 Cal. Rptr. at 710. The court further reasoned that under section 5161 a custody decree rendered in California is binding in this state only if the rendering court had jurisdiction under section 5152. Moreover, a custody decree under the Uniform Act is entitled to interstate recognition only if issued by a state "which had assumed jurisdiction under statutory provisions substantially in accordance with this title or which was made under factual circumstances meeting the jurisdictional standards of the title." . . . The Uniform Act clearly contemplates that all custody decrees made in states that have enacted the UCCJA will be made only when jurisdiction exists under the act. Thus, the act's purpose to "[a]void jurisdiction competition and conflict with courts of other states in matters of child custody" . . . is directed not just to present conflicts but to the potential for conflicts in the future. The jurisdictional requirements, therefore, of sec-

tion 5152 apply to all custody cases in California, not just to those where a present conflict exists.

(Citations omitted.) *Id.* at 583-84, 260 Cal. Rptr. at 710. The relevant purposes and provisions of the NCCJA are virtually identical to those cited in the Uniform Act, and we are persuaded by the California Court of Appeals' reasoning. Thus, we hold that the NCCJA's purpose to "[a]void jurisdictional competition and conflict with courts of other states in matters of child custody . . . ," § 43-1201(1)(a), is directed not just to present conflicts but to the potential for conflicts in the future. Therefore, the jurisdictional requirements of the NCCJA apply in the instant case even though a jurisdictional conflict does not currently exist with another state.

Since the jurisdictional requirements of the NCCJA are applicable, it must be determined whether the juvenile court properly exercised its jurisdiction. In determining whether a court should entertain a child custody proceeding having interstate implications, the court should first determine whether it has jurisdiction and then determine whether it is appropriate to exercise jurisdiction. *Van Norman v. Upperman,* 231 Neb. 524, 436 N.W.2d 834 (1989).

(a) Subject Matter Jurisdiction

As previously noted, there has been no custody determination by another state regarding Floyd. Thus, the juvenile court was exercising initial jurisdiction over Floyd. The juvenile court had jurisdiction to make a child custody determination by initial decree if one of the four following grounds of jurisdiction existed: (1) home state jurisdiction, (2) significant connection jurisdiction, (3) emergency jurisdiction, or (4) default jurisdiction (when no other state would have jurisdiction or when another state has declined to exercise jurisdiction, and it is in the best interests of the child that the court assume jurisdiction). § 43-1203.

First, home state jurisdiction was not present, because Floyd has been a resident of Alabama exclusively and continuously for at least 6 consecutive months prior to the filing of the petition on December 11, 1996. See § 43-1202(5). Second, significant connection jurisdiction was not present because Floyd lives and attends school in Alabama and Floyd was only visiting

Nebraska at the time that he was taken into protective custody. Third, default jurisdiction was not present, as it is clear that Alabama would have jurisdiction over the action. In addition, although referrals had previously been made in both Alabama and Colorado regarding the father's past physical abuse of Floyd, neither state has been notified of the new allegations raised in the State's petition, and thus, neither has had an opportunity to decline jurisdiction regarding the instant matter.

However, with regard to the December 18, 1996, order granting temporary custody of Floyd to the department, the juvenile court clearly had emergency jurisdiction over Floyd. The emergency jurisdiction provision of the NCCJA permits a juvenile court to assume jurisdiction of a child who is physically present in this state when (1) the child has been abandoned or (2) it is necessary in an emergency to protect the child because he or she has been subjected to or threatened with mistreatment or abuse or is otherwise neglected. § 43-1203(1)(c); *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996). A child's presence in this state alone is sufficient to confer jurisdiction on a court to make a child custody determination under the emergency provision. § 43-1203(2); *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992).

In the instant case, the record is replete with evidence that it was necessary for the juvenile court to place Floyd in temporary custody with the department in order to protect him from future maltreatment by the father. Indeed, evidence was adduced that Floyd had received a black eye, a bruise on his thigh, and a mark on his tongue after the father discovered that Floyd had altered his report card. In addition, there was evidence that the father hits Floyd on almost a daily basis and that he has been hit with belts, boat paddles, and extension cords. Based on the evidence of this ongoing pattern of abuse and because Floyd was physically present in Nebraska, the juvenile court properly exercised emergency jurisdiction over Floyd.

The father contends that even if the court had emergency jurisdiction, such jurisdiction was limited in nature to an entry of temporary orders pending the court's conferral with the state having regular jurisdiction. The father claims that the court erred in failing to confer with Alabama or Colorado to deter-

mine the appropriate forum for adjudicating the custody of Floyd. While it is true that emergency jurisdiction is temporary in nature and confers only the power " ' "to make temporary orders, including temporary custody for a limited period of time, pending proceedings in the state with regular jurisdiction under the [NCCJA]," ' " *Smith-Helstrom v. Yonker*, 249 Neb. at 457, 544 N.W.2d at 100. The juvenile court's December 18, 1996, order complied with the law in that it mandated that the department retain only *temporary* custody over Floyd. Accord *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). Moreover, the failure to communicate with a court of another state does not divest the juvenile court of subject matter jurisdiction. *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994). Thus, the juvenile court did not err in failing to confer with Alabama or Colorado before making its emergency, temporary order.

The father further contends that even if the juvenile court did not err in failing to confer with Alabama or Colorado, an emergency situation does not persist with respect to Floyd so as to support the court's continuing to exercise emergency jurisdiction over Floyd. The father claims that any emergency was eliminated by the mother's offer to take Floyd home with her to Colorado. While a court should assume temporary jurisdiction only for the duration of the emergency and should terminate its jurisdiction after the emergency has passed, *Sheila L. v. Ronald P.M.*, 195 W. Va. 210, 465 S.E.2d 210 (1995); *In Interest of S.L.*, 872 S.W.2d 573 (Mo. App. 1994); *Matter of E.H.*, 612 N.E.2d 174 (Ind. App. 1993); *In re Lemond*, 274 Ind. 505, 413 N.E.2d 228 (1980), the evidence adduced at the December 16, 1996, hearing supports a finding that the emergency situation was, in fact, ongoing. See *In re Interest of L.W., supra.*

*In re Interest of L.W., supra*, provides guidance for determining when an emergency situation is ongoing. In that case, we stated:

> The juvenile court can assume jurisdiction under [the emergency jurisdiction] provision, since the child [was] physically present in this state and was sexually abused by her stepfather. The emergency situation [was] ongoing, since the case report show[ed] that the mother continue[d]

to be influenced and directed by the men in her life and [did] not attend the child's counseling sessions. The record also show[ed] that due to the instability of the mother's relationships and the fear expressed by the child of the men in her mother's life, DSS cannot be assured of the child's safety if she [were] returned to her mother.

*In re Interest of L.W.*, 241 Neb. 84, 99, 486 N.W.2d 486, 497 (1992). In addition, it must be noted that this case is before us on de novo review; therefore, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. Grape v. Zach, supra.*

Keeping the foregoing in mind, it is apparent that the mother's offer to take Floyd home with her to Colorado would not eliminate the pending emergency situation. In the recent past, the mother has been contacted by authorities, such as the Alabama Department of Social Services, regarding the abuse of Floyd by his father, but nevertheless failed to take steps to protect Floyd. In addition, Phelps testified that the mother had told her on several occasions that she was afraid that Floyd was being physically abused by his father and that the mother specifically asked Phelps to check Floyd for bruises while Floyd was visiting in Nebraska. However, despite the mother's suspicions, she allowed Floyd to continue to reside with his father in Alabama. Finally, King, a Child Protective Services worker, testified that, in her opinion, Floyd was "at [a] very high risk for future maltreatment if returned to either parent at this time."

Clearly, there was ample evidence to support the juvenile court's finding that it could not be assured that Floyd would remain safe if he were returned to his mother. Thus, we conclude upon de novo review of the record that it is in Floyd's best interests that the department retain temporary custody over him pending further proceedings. Accordingly, because the emergency situation was ongoing, the juvenile court properly exercised emergency jurisdiction over Floyd.

### (b) Inconvenient Forum

The father next contends that even if the juvenile court had jurisdiction, the court should have declined to exercise jurisdiction because under the NCCJA, Nebraska was an inconvenient forum for the proceedings. According to the NCCJA, a court which has jurisdiction to make an initial decree may decline to exercise its jurisdiction at any time prior to making a decree if the court finds that it is an inconvenient forum and that a court of another state is a more appropriate forum. § 43-1207(1); *Van Norman v. Upperman*, 231 Neb. 524, 436 N.W.2d 834 (1989). To determine whether a court is an inconvenient forum, the court shall consider the following factors, among others, to determine if it is in the best interests of the child that another state assume jurisdiction: (1) another state is or recently was the child's home state; (2) another state has a closer connection with the child and his or her family; (3) substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state; (4) the parties have agreed on another forum which is no less appropriate; and (5) the exercise of jurisdiction by a court of this state would contravene a purpose [of the NCCJA]. § 43-1207(3). " '[A] paramount consideration in the balancing of these various factors is a determination of what court is most able to act in the best interests of the [child]. . . .' " *Van Norman v. Upperman*, 231 Neb. at 527, 436 N.W.2d at 836.

In applying the factors to the case at bar, Nebraska was a convenient forum for the custody proceedings and was the court most able to act in the best interests of Floyd, especially in light of the fact that the proceedings were emergency in nature. Additionally, because the department's investigation took place in Nebraska and because King, the Child Protective Services worker, and Phelps, who had seen both Floyd and his bruises, were in Nebraska, we conclude that substantial evidence existed in this state to make Nebraska a convenient forum for the emergency proceedings. Furthermore, because no other state has been willing or has sought to exercise jurisdiction to protect Floyd, the interests of Floyd would be best served by the Nebraska court's exercising jurisdiction to protect him. We,

therefore, hold that the juvenile court did not abuse its discretion in exercising jurisdiction based on the evidence in this case.

### 3. EVIDENCE

#### (a) Parents' Financial Condition

The father claims that the juvenile court erred in sustaining relevance objections to questions regarding the father's and the mother's financial condition, as this evidence was relevant to determine whether Nebraska was an inconvenient forum for the proceedings. Specifically, because the mother lives in Colorado and the father in Alabama and both live on limited incomes, the father claims that traveling to Nebraska to attend hearings would be financially difficult, thereby making Nebraska an inconvenient forum.

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence, or the evidence tends to establish a fact from which the existence or nonexistence of a fact in issue can be directly inferred. Neb. Rev. Stat. § 27-401 (Reissue 1995); *Alexander v. Warehouse*, 253 Neb. 153, 568 N.W.2d 892 (1997); *Benzel v. Keller Indus.*, 253 Neb. 20, 567 N.W.2d 552 (1997). We determine that the father's claim has merit in that evidence of the parents' financial condition was relevant to one of the issues before the juvenile court, namely, whether Nebraska was an inconvenient forum for the proceedings under the NCCJA. See *Van Norman v. Upperman*, 231 Neb. 524, 436 N.W.2d 834 (1989). Thus, the juvenile court did abuse its discretion in finding that the evidence was irrelevant to determine whether Nebraska was an inconvenient forum. However, in our de novo review of whether Nebraska was an inconvenient forum to conduct the emergency proceedings, we considered the financial evidence contained in the father's offers of proof and, given the totality of the circumstances, determine that Nebraska was an appropriate forum for these proceedings.

#### (b) Criminal History and Child Abuse

Finally, the father argues that evidence of his physical abuse of his daughter, his incarceration for assault, and his having

been charged with child abuse was irrelevant evidence of other crimes or acts which should have been excluded in accordance with Neb. Rev. Stat. § 27-404(2) (Reissue 1995). While we recognize that only relaxed rules of evidence apply at a hearing to determine who shall have temporary custody of a juvenile pending an adjudication, *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), fundamental due process requirements must still be satisfied with regard to the type of evidence used to determine temporary custody. In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost in that determination. See *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992).

In accordance with § 27-404(2), evidence of other crimes or bad acts may be admissible for the purposes of showing proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Section 27-404(2) allows the use of evidence of other crimes or bad acts if such evidence is relevant for any purpose other than to show the individual's propensity to commit the act alleged. *State v. Buckman*, 237 Neb. 936, 468 N.W.2d 589 (1991). Absent an abuse of discretion, a trial court's ruling on the admission or exclusion of evidence of other wrongs or acts will not be disturbed on appeal. *Id.*

The admission of evidence that the father had physically abused his daughter, that the father had been incarcerated for assault, and that the father had been charged with child abuse was not an abuse of discretion in these emergency proceedings. The evidence was tendered to prove identity or the absence of mistake or accident, i.e., that the father was the individual who inflicted the bruises on Floyd and that the father inflicted such bruises intentionally, rather than by mistake or accident. See *State v. Stephens*, 237 Neb. 551, 466 N.W.2d 781 (1991). Accordingly, we conclude that the admission of the foregoing evidence did not violate due process requirements and, thus, that the juvenile court did not abuse its discretion in admitting such evidence.

## V. CONCLUSION

Having considered all of the father's assignments of error and finding them to be without merit, we affirm the juvenile court's order granting the department temporary custody over Floyd until further order of the court.

AFFIRMED.