IN RE INTEREST OF KELLEY D. AND HEATHER D.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. LARRY D., APPELLANT.
590 N.W.2d 392

Filed March 12, 1999.    Nos. S-98-221, S-98-222.

Louie M. Ligouri for appellant.

Marcia J. Scott, guardian ad litem, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

The father, Larry D., appeals from separate orders of the Nemaha County Court, sitting as a juvenile court, adjudicating his daughters, Kelley D. and Heather D., to be juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 1997) and ordering a home study and the development of a case plan.

## SCOPE OF REVIEW

When a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from that of the trial court. However, when the determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. *In re Interest of Floyd B.*, 254 Neb. 443, 577 N.W.2d 535 (1998).

The question as to whether jurisdiction existing under the Nebraska Child Custody Jurisdiction Act (NCCJA), Neb. Rev. Stat. §§ 43-1201 through 43-1225 (Reissue 1998), should be exercised is entrusted to the discretion of the trial court and is reviewed de novo on the record. As in other matters entrusted to a trial judge's discretion, absent an abuse of discretion, the decision will be upheld on appeal. *In re Interest of Floyd B., supra.*

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Gloria F.*, 254 Neb. 531, 577 N.W.2d 296 (1998).

## FACTS

Kelley and Heather lived with their father and stepmother in Laredo, Texas, for several years. On approximately June 2,

1997, Kelley, age 10, and Heather, age 9, went to Auburn, Nebraska, for a summer visit with their paternal grandmother. The grandmother felt that the girls were withdrawn, and she sent them to see Maureen Schultz, a mental health practitioner. Schultz counseled the girls approximately once a week and noted that they both exhibited feelings of hopelessness and helplessness, a wish to die, withdrawal, and low self-esteem. She diagnosed the girls as suffering from adjustment disorder with depression and concluded that their condition was caused by physical and emotional abuse perpetrated in Texas by their father and stepmother.

Schultz contacted the Nebraska Department of Health and Human Services in Auburn, and on August 14, 1997, the County Attorney for Nemaha County filed petitions in Nemaha County Court, alleging that Kelley and Heather were juveniles who lacked proper parental care by reason of the fault or habits of their father, as described in § 43-247(3)(a). The father objected to the jurisdiction of the court for the reasons that the home state of the girls was Texas and that the alleged abusive acts occurred in Texas.

Over the father's objection, affidavits were received for the limited purpose of issues relating to availability of witnesses, determination of the home state, and determination of jurisdiction. The affidavits stated, inter alia, that there were no proceedings relating to Kelley or Heather in another jurisdiction; the only professional counseling for the girls occurred in Nemaha County; the paternal grandmother, aunt, and uncle all reside in or near Nemaha County; at the time of the hearing, the girls had resided in Nemaha County for 6 months; and the well-being of the girls depended upon the continued jurisdiction of the Nemaha County Court, as they would be in danger of further abuse and neglect if returned to the home of their father and stepmother. The court determined that it had emergency jurisdiction pursuant to § 43-1203(1)(c).

In consideration of the girls' ages and the nature of the allegations, the juvenile court authorized accommodation for their testimony so they would be seated in such a way as to not be required to look directly at their father. The court overruled the father's objection that this accommodation violated his right to

confrontation. When testifying, the girls sat diagonally toward the bench, and counsel were allowed to approach the bench during questioning. The girls sat at approximately a 90-degree angle to their father. While sitting at counsel table, the father's counsel was able to see the sides of the girls' faces, but not their eyes, and the father was able to see mostly their backs.

Kelley testified that her father had hit her with a belt on the back of her thighs on between 5 and 10 different occasions. Once in the spring of 1997, her father hit her approximately 20 times, leaving bruises. Kelley testified that during the week, the girls were not allowed to go to the bathroom before or during breakfast and that they were not allowed to sit down while eating. Kelley stated that her father regularly called her names, such as "BBBT," which stood for "big butted bird turd"; "stupid"; "idiot"; and "asshole." Kelley stated that her stepmother hit the girls on many occasions with a shoe or a flyswatter. According to Kelley, on one or two occasions the stepmother also made the girls stand with their hands against a wall and their feet away from the wall for half an hour. Kelley testified that on other occasions, her father made her stand with her lips against the wall for more than half an hour. She further stated that sometimes her father would painfully pull her hair. Kelley testified that she was afraid of her father because he hit the girls a lot.

Heather testified that both her father and stepmother had hit her in May 1997. Heather stated that her stepmother would hit the girls almost every day with her hand, a sandal, or a flyswatter and that she would hit them on whatever part of their bodies she could reach. Heather described an incident where their stepbrother tried to hit the girls with a toy baseball bat and the stepmother grabbed the bat and began hitting the girls to demonstrate to the stepbrother how it was done. Heather stated that her father would hit her once or twice a week with a special belt, although on cross-examination, she agreed with Kelley's statement that it was 5 to 10 occasions. Heather stated that the belt sometimes caused bruising and that the girls were usually asked to bring their father the belt. She described the belt as leather with metal diamonds and "half worlds" going down it. Heather also testified that the girls were not allowed to go to the bath-

room before or during breakfast and that they had to eat standing up. Heather stated that on one occasion the previous year, when the stepmother refused to let her use the bathroom while Heather was washing dishes, she wet her pants. Heather stated that several times, her stepmother would make the girls stand with their hands on the wall "so that we would get tired faster than just standing in the corner" and that they had to stand that way for half an hour or an hour. At other times, their father would make them stand with their noses to the wall, sometimes for over half an hour. Heather testified that her father called the girls bad names, including "butt-head," "asshole," "dummy," and "stupid." Heather testified that she was afraid of her father.

Kelley and Heather's uncle also testified on their behalf. The uncle testified that he went with the girls' grandmother to pick them up for the summer visit and that he stayed at the girls' home in Texas for 3 days. During that time, he observed that the father never called the girls by their proper names, but, instead, called them "dummy" or "stupid." The uncle stated that he had observed that Kelley feared her father and that he observed one occasion where the father belittled her about having a training bra and grabbed and snapped her bra strap in front of company. On another occasion, the uncle observed the father get angry with Kelley and threaten her with his belt.

The father generally denied the truth of the statements made by Kelley, Heather, the uncle, and Schultz. The father stated that there had been a couple of times when he spanked the girls with a belt, but not hard enough to leave marks. He stated that the bra-snapping incident was all in good humor. The father admitted that on one occasion, he may have called one of the girls "dummy" and explained that "[b]ig fat bird turd" was a joke.

On February 10, 1998, the juvenile court made findings of fact, which we have summarized as follows: (1) The evidence in this matter regarding the type and severity of discipline imposed is in conflict; (2) in the spring of 1997, the father used inappropriate punishment by striking the girls with a belt, causing bruising, and there are other instances of use of a belt and inappropriate discipline measures by both the father and the stepmother that have occurred within the past 12 months; (3) the father has engaged in language and behavior which is demean-

ing and belittling to the girls; (4) the father is lacking in parenting skills, which affects the best interests of the girls; (5) the girls have suffered and are suffering psychological damage as a result of the father's and stepmother's behavior, such as depression, withdrawal, feelings of helplessness, and nightmares; (6) the girls are genuinely afraid of their father; and (7) on or about August 11, the girls were residing with their grandmother in Nemaha County, Nebraska, when their summer stay was about to end and the girls would be required to return to Texas with their father upon his demand for their return.

The juvenile court concluded that the girls were within its jurisdiction and fell under the provisions of § 43-247(3)(a), in that they lacked proper parental care by reason of the fault or habits of their father relating to his ability to properly administer and supervise proper discipline and to properly care for and provide for the mental health needs of the girls. The court suspended further proceedings and ordered a case plan and report to be prepared by the Department of Health and Human Services, including a home study. The court found that the department should continue to undertake reasonable efforts to prevent or eliminate the need for removal of the girls from the parental home and to make appropriate arrangements for visitation and parental contact.

The father appeals from the February 10, 1998, orders rendering an adjudication that the girls were juveniles within the meaning of § 43-247(3)(a) and ordering that a case plan be developed.

## ASSIGNMENTS OF ERROR

The father assigns as error the following: (1) The juvenile court erred in rejecting the State of Texas as the home state and proper forum for the exercise of jurisdiction under the NCCJA; (2) the juvenile court erred in denying him the right of confrontation under Neb. Rev. Stat. § 43-279.01 (Reissue 1998) and applicable provisions of the Bill of Rights encompassed within the Nebraska and U.S. Constitutions; (3) the proceedings below, including the unilateral actions undertaken to divest the State of Texas of jurisdiction in favor of the State of Nebraska; the preadjudication affidavits setting forth opinions and other

expressions of credibility, culpability, and guilt; and the ongoing process of promoting the juveniles' being fostered in a household in direct custodial opposition to their father, are contrary to Neb. Rev. Stat. § 43-246(4) and (5) (Cum. Supp. 1996) and are error upon the record presented; and (4) the purported evidentiary facts introduced at the adjudication hearing did not correspond to the harm alleged by the State within the amended petition, and the juvenile court's order of adjudication is contrary both to law and to the applicable facts.

## ANALYSIS

### JURISDICTION

We first address the issue of whether the juvenile court properly exercised jurisdiction over Kelley and Heather. The guardian ad litem argues that the court properly exercised emergency jurisdiction pursuant to § 43-1203(1)(c)(ii) of the NCCJA. In contrast, the father argues that the court did not properly exercise jurisdiction under the NCCJA because the State of Texas is the home state and proper forum for the exercise of jurisdiction.

When a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from that of the trial court. However, when the determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. *In re Interest of Floyd B.*, 254 Neb. 443, 577 N.W.2d 535 (1998). The question as to whether jurisdiction existing under the NCCJA should be exercised is entrusted to the discretion of the trial court and is reviewed de novo on the record. As in other matters entrusted to a trial judge's discretion, absent an abuse of discretion, the decision will be upheld on appeal. *Id.*

Section 43-1203(1) of the NCCJA, the "emergency jurisdiction provision," provides in part that a court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the child is physically present in this state and it is necessary in an emergency to protect the child because he or she

has been subjected to or threatened with mistreatment or abuse or is otherwise neglected. Section 43-247(3)(a) is incorporated into the NCCJA and provides in part that the juvenile court in each county shall have jurisdiction of any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." See, *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992); § 43-1202(3)(b).

Physical presence of the child in this state alone is sufficient to confer jurisdiction on a court to make a child custody determination under § 43-1203(1)(c). *In re Interest of Floyd B., supra; In re Interest of L.W., supra.* Thus, in *In re Interest of Floyd B.*, we held that the juvenile court properly exercised emergency jurisdiction over a child even though neither the child nor his parents resided in Nebraska and the alleged abusive acts did not occur in Nebraska.

In *In re Interest of Floyd B.*, the child had been placed in the protective custody of the then Department of Social Services, now the Department of Health and Human Services, while he and his father were visiting relatives in Nebraska over a Thanksgiving holiday. Family members had noticed bruising on the child and contacted the police. The evidence indicated that although the department of social services in the father's home state had conducted an investigation, there were no proceedings pending there.

We explained that the evidence presented at the hearing of an ongoing pattern of abuse, coupled with the fact that the child was physically present in Nebraska, conferred emergency jurisdiction on the juvenile court. We further explained that the emergency was ongoing because return of the child to either parent would put him at risk for future maltreatment.

We also concluded that Nebraska was a convenient forum for the proceedings. To determine whether a court is an inconvenient forum under the NCCJA, the court considers the following factors, among others, to determine if it is in the best interests of the child that another state assume jurisdiction: (1) Another state is or recently was the child's home state; (2) another state has a closer connection with the child and his or her family; (3) substantial evidence concerning the child's present or future care, protection, training, and personal relation-

ships is more readily available in another state; (4) the parties have agreed on another forum which is no less appropriate; and (5) the exercise of jurisdiction by a court of this state would contravene a purpose of the NCCJA. *In re Interest of Floyd B.*, 254 Neb. 443, 577 N.W.2d 535 (1998); § 43-1207(3). A paramount consideration in the balancing of these various factors is a determination of what court is most able to act in the best interests of the child. See *In re Interest of Floyd B., supra.*

We stated that despite the fact that Nebraska was not the home state, the Nebraska court was most able to act in the child's best interests. We noted that the Department of Social Services' investigation took place in Nebraska and that the Child Protective Services worker who had seen the child and his bruises was in Nebraska. We also noted that no other state had sought to exercise jurisdiction to protect the child.

When the petitions were filed in the instant case, Kelley and Heather were physically present in Nebraska, and the evidence at the adjudication hearing indicated an ongoing pattern of abuse and a danger to the girls if they were returned to their father. While the father argues that there are many witnesses in Texas who could testify that they had never seen bruises or other evidence of abuse, this fact was undisputed at the hearing. Thus, the fact that these witnesses are located in Texas does not indicate that Nebraska is an inconvenient forum. In contrast, other witnesses, such as Schultz, who assessed the psychological damage caused by the abuse, and the girls themselves, are currently in Nebraska. Other than the father and stepmother, there appears to be no significant witness in Texas to the abuse, and the Texas courts have not undertaken any proceedings to protect the girls. Thus, we conclude that the Nemaha County Court, sitting as a juvenile court, had emergency jurisdiction and that it did not abuse its discretion in exercising such jurisdiction.

However, we are concerned by the fact that in its exercise of emergency jurisdiction, the juvenile court ordered a case plan and report to be prepared by the Department of Health and Human Services, including a home study. Emergency jurisdiction under § 43-1203(1)(c) is by its very nature limited. *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996). It is temporary in nature and confers only the power to make tem-

porary orders, including temporary custody for a limited period of time, pending proceedings in the state with regular jurisdiction under the NCCJA. *In re Interest of Floyd B., supra.*

If the juvenile court attempts to continue to exercise jurisdiction over Kelley and Heather, it must do so under another provision of the NCCJA. Texas is the home state of the girls, and they were merely visiting Nebraska at the time they were taken into protective custody. Section 43-1203(1)(d), the "default provision," provides for jurisdiction if another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child and if it is in the best interests of the child that this state assume jurisdiction. See *In re Interest of Floyd B., supra.* In order to assume jurisdiction under § 43-1203(1)(d), a communication must be received from the other state informing this state that it has declined jurisdiction and considers this state to be the more appropriate forum. See § 43-1207(9). Such information may be provided by one of the parties or obtained by the juvenile court; however, in obtaining such information, the court should avoid communications outside the presence of the parties. See *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994). The parties or the court may attempt to gain such information pursuant to the mechanisms provided in the NCCJA, but absent such information from Texas, the Nemaha County Court should not attempt to continue to exercise jurisdiction.

### WHETHER ORDERS WERE SUPPORTED BY EVIDENCE

We next address the father's assertion that the juvenile court's orders were not supported by the evidence. The father points out that many of the allegations against him were not established at the hearing and that there were certain inconsistencies between the testimony of Kelley and Heather.

Section 43-279.01(3) provides that when adjudicating whether a juvenile is dependent or neglected within the purview of § 43-247(3)(a), the State must establish its allegations by a preponderance of the evidence. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350

(1998). Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Gloria F.*, 254 Neb. 531, 577 N.W.2d 296 (1998).

The testimony of Kelley and Heather indicates that they were hit by the father with a belt, causing bruising; that they were made to eat breakfast daily while standing up and having not been allowed to use the restroom; and that they were regularly called names by the father such as "dummy," "stupid," "butt-head," and "asshole." Schultz diagnosed the girls with adjustment disorder with depression and concluded that their condition was caused by physical and emotional abuse perpetrated in Texas by their father and stepmother. We conclude that the State has shown by a preponderance of the evidence that in accordance with § 43-247(3)(a), the girls lacked proper care by reason of the fault or habits of a parent.

## CONFRONTATION

The father also argues that Kelley and Heather's positioning while testifying and the admission of certain affidavits denied him his right to confront and cross-examine witnesses. The father concedes that the right to confrontation under the Sixth Amendment to the U.S. Constitution does not directly apply to proceedings in juvenile court, but he argues that his right to confrontation derives from his right to fundamental due process and his rights as set forth in § 43-279.01.

The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of C.P.*, 235 Neb. 276, 455 N.W.2d 138 (1990). The concept of due process embodies the notion of fundamental fairness and defies precise definition. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and

cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *Id.*

Section 43-279.01(1) states in part that when the petition alleges the juvenile to be within the provisions of § 43-247(3)(a) and the parent or custodian appears, the court shall inform the parties of the right to confront and cross-examine witnesses. In deciding due process requirements in a particular case, we must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the procedures in use. See *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991). Due process is flexible and calls for such procedural protections as the particular situation demands. *In re Interest of L.V., supra.*

Both Kelley and Heather testified in the courtroom, and the finder of fact was able to fully see their facial expressions. The father sat approximately 10 to 12 feet from the girls and had a means of communicating with his counsel during their testimony. The juvenile court was able to control the examination and rule on objections, and the father's counsel was able to fully view the witnesses' facial expressions during his cross-examination. We conclude that in these proceedings for temporary adjudication, the manner in which the girls were situated during questioning did not violate any right of fundamental fairness or confrontation, nor did it violate § 43-279.01(1)(d).

The affidavits which the father complains denied him his right to confront and cross-examine were entered solely for the purpose of determining jurisdiction. Thus, the juvenile court received them to determine where, for example, relevant witnesses resided. The court did not receive them for the veracity of the statements, which the father asserts accuse him of committing abusive acts without such accusations' being subject to cross-examination.

Regardless, in a trial to the court, the presumption is that the trial court considered only such evidence as is competent and relevant, and the reviewing court will not reverse such a case because evidence was erroneously admitted where there is other material, competent, and relevant evidence sufficient to sustain

the judgment. *In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985).

Even if we were to assume that the affidavits were inadmissible and violated the father's right to confrontation, we have reviewed the other evidence de novo on the record and find that it is sufficient to support the juvenile court's order.

## § 43-246

Finally, the father asserts that the actions of the juvenile court are contrary to § 43-246(4) and (5). Section 43-246 provides that the Nebraska Juvenile Code shall be construed to effectuate certain listed purposes. Section 43-246(4) states that the code seeks to achieve its purposes in the juvenile's own home whenever possible, separating the juvenile from his or her parent only when necessary for his or her welfare or in the interest of public safety and, when temporary separation is necessary, to consider the developmental needs of the individual juvenile in all placements, to consider relatives as a preferred potential placement resource, and to assure every reasonable effort possible to reunite the juvenile and his or her family. Section 43-246(5) states that the code is to provide a judicial procedure through which the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced.

As far as we can ascertain from the father's argument, the actions alleged to be contrary to § 43-246 are (1) the exercise of jurisdiction outside the home state, (2) the way in which Kelley and Heather were positioned on the witness stand, and (3) the admission of affidavits setting forth opinions of credibility, culpability, and guilt. These issues have been adequately addressed by the foregoing discussion, and we find the father's argument that the juvenile court violated § 43-246 to be without merit.

## CONCLUSION

The judgments of the juvenile court are affirmed.

AFFIRMED.