IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF NOAH C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NOAH C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SAMANTHA H., APPELLANT.

Filed October 2, 2018.    No. A-18-059.

Appeal from the County Court for Cheyenne County: RANDIN R. ROLAND, Judge. Affirmed.

Donald J.B. Miller, Cheyenne County Public Defender, for appellant.

Jonathon T. Stellar, Chief Deputy Cheyenne County Attorney, for appellee.

Audrey M. Elliott, guardian ad litem.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

### I. INTRODUCTION

Noah C. was removed from his mother, Samantha H., because there were concerns about his safety. Samantha appeals from the December 19, 2017, order of the county court for Cheyenne County, sitting as a juvenile court, which allowed the continued detention of Noah pending adjudication. Samantha also appeals the juvenile court's January 17, 2018, order adjudicating Noah pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). We affirm both orders.

- 1 -

## II. BACKGROUND

Samantha is the biological mother of Noah (born in 2013). Because Noah's father, Donald M., is not part of this appeal, he will only be discussed as necessary.

From late October 2016 to January 2017, the Nebraska Department of Health and Human Services (DHHS) worked with Samantha and Noah in an alternative response case (a voluntary case), because Samantha sought help to deal with Noah's behaviors. That case ended upon Samantha's request.

In late November and early December 2017, DHHS became concerned about Noah's welfare after Samantha told numerous persons that she could not handle his behaviors and that she needed a break.

On December 6, 2017, the State filed a petition alleging that Noah was a child within the meaning of § 43-247(3)(a) for the reason that he was in a situation injurious to his health or morals. The State further alleged that Samantha had expressed frustration that she was having difficulty parenting Noah. Also on December 6, the State requested an ex parte temporary custody order, which was granted by the court that same day. Pursuant to the order, DHHS was granted the temporary care, custody, and control of Noah, and placement was not to be in his parental home.

On December 18, 2017, Samantha filed for a motion for change of placement, requesting that Noah be placed with her "pending the adjudication in this case." After a hearing on December 19, Samantha's motion for change of placement was denied and Noah continued to be placed in the temporary custody of DHHS.

A contested adjudication hearing was held on January 8, 16, and 17, 2018. In its journal entry and order filed on January 17, the juvenile court determined that Noah was a child as defined by § 43-247(3)(a) and adjudicated him accordingly.

Samantha timely filed her notice of appeal on January 18, 2018; she appeals from the order of December 19, 2017, and the order of January 17, 2018.

We note that in their joint brief, the State and the guardian ad litem claim that Samantha did not preserve her right to appeal the December 19, 2017, placement order "because she did not file her notice of appeal within thirty days of the court's order." Brief for appellee at 18. (When referring to arguments made on appeal, the State and the guardian ad litem will collectively be referred to as the State.) However, the State relies on the date Samantha's notice of appeal was filed with the Clerk of the Supreme Court (January 22, 2018), rather than the date the notice of appeal was filed with the clerk of the county court for Cheyenne County (January 18). See Neb. Ct. R. App. P. § 2-101(A) (appeal perfected when notice of appeal has been filed in office of clerk of trial court). Samantha has timely appealed from the December 19 order.

## III. ASSIGNMENTS OF ERROR

Samantha assigns, summarized and reordered, that the juvenile court erred in (1) granting the motion for ex parte custody, (2) admitting certain evidence at the detention hearing, (3) denying her motion for change of placement and approving the continued detention of Noah pending adjudication, (4) authorizing two witnesses to appear and testify by videoconference at the adjudication hearing over her objections, (5) admitting certain evidence at the adjudication hearing, and (6) finding sufficient evidence that Noah was a child as described under § 43-247(3)(a).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

## V. ANALYSIS

### 1. Ex Parte Custody Order

Samantha argues that the juvenile court erred in granting the State's motion for ex parte custody. She also argues that the juvenile court erred in approving DHHS' removal and continued detention of Noah pending adjudication and in denying her motion for change of placement.

> Although an ex parte temporary detention order keeping a juvenile's custody from his or her parent for a short period of time is not final, one entered under § 43-247(3)(a) and Neb. Rev. Stat. § 43-254 (Reissue 1988), after a hearing which continues to keep a juvenile's custody from the parent pending an adjudication hearing to determine whether the juvenile is neglected, is final and thus appealable.

*In re Interest of R.R.*, 239 Neb. 250, 252-53, 475 N.W.2d 518, 520 (1991). See, also, *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013) (appellate court found it was without jurisdiction to consider mother's argument that county court erred in granting temporary ex parte custody order because ex parte order was not final order; but stating detention order entered after detention hearing was final, appealable order). Because the ex parte temporary custody order was not a final order, we cannot consider Samantha's argument that the juvenile court erred in granting the ex parte order. However, the juvenile court's order of December 19, 2017, which, following a hearing, denied Samantha's motion for placement and continued the detention of Noah pending adjudication was a final, appealable order.

### 2. Continued Detention of Noah Pending Adjudication

#### (a) General Principles of Law

Neb. Rev. Stat. § 43-254 (Reissue 2016) provides, in relevant part:

> Pending the adjudication of any case, . . . if it appears that the need for placement or further detention exists, the juvenile may be (1) placed or detained a reasonable period of time on order of the court in the temporary custody of either the person having charge of the juvenile or some other suitable person, . . . [or] (5) placed in the temporary care and custody of the Department of Health and Human Services when it does not appear that there is any need for secure detention, . . .

If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (2) of section 43-248 [juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection], the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). In analyzing this question, the issue is whether allowing Noah to live with Samantha is contrary to his welfare.

Before summarizing the testimony presented at the continued detention hearing, we first note that Samantha contends the juvenile court erred in admitting certain evidence at the detention hearing. At a hearing to determine who shall have custody of a juvenile pending an adjudication, Neb. Rev. Stat. § 43-283 (Reissue 2016) applies, and relaxed rules of evidence may be followed. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved of on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). See, also, § 43-283 ("[s]trict rules of evidence shall not be applied at any dispositional hearing"). In circumstances whereunder relaxed rules of evidence may be employed, due process requires that the proceedings be fundamentally fair. *In re Interest of R.G., supra*. In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost in that determination. *In re Interest of Floyd B.*, 254 Neb. 443, 577 N.W.2d 535 (1998). We will note Samantha's objections at issue in the relevant portions of the witness testimony.

(b) Testimony From Detention Hearing

Mindy Estrada is the family advocate for Head Start, where Noah attended preschool. Estrada testified that at Head Start, Noah was "a typical preschooler, four-year-old" and there were no behaviors she would consider "out of norm." Samantha called Estrada on November 29, 2017, asking for services and referrals because Samantha could not handle Noah and his behaviors (he was not listening, he would grab things out of the refrigerator and make messes on the floor, and he found an unlocked medicine cabinet). Estrada asked Samantha if they were safe and if they needed help immediately; Samantha said that if she could get services within the next couple days everything would be good, but if it was going to be a week or more, then that would not work. Estrada asked Samantha what services she had in the past, because she did not want to duplicate services that had not worked. Estrada told Samantha she would look into services and see what they could offer her. She suggested that Samantha take Noah to school at 8 a.m. and pick him up at 2 p.m., which would give Samantha a 6-hour break; Noah's attendance at preschool had been "[s]poradic" in that there was not a consistent pattern for what time he would be dropped off at school. Samantha responded that she was not a morning person so she had a hard time getting him to school, and additionally, that Noah did not sleep very well and sometimes would not go to sleep

until 2 or 3 a.m., so it was hard to get him up in the morning. After talking to her supervisor, Estrada called DHHS and was told that somebody had already reported Samantha and that there was an intake in process.

Sarah Robinson, a children and family service specialist at DHHS, was the initial worker on the intake and the current caseworker for Noah and Samantha. Robinson and a law enforcement officer met Samantha in her home on December 1, 2017, in regards to the intake. Samantha said she was having several issues with Noah, and discussed other things going on in the home. For instance, one time Noah got up in the middle of the night and emptied the fish tank, so that there was water on the kitchen floor and only about 1 or 2 inches of water left in the tank. Samantha also said that Noah would get into things that she had locked up, would leave the apartment without her knowledge, and was not able to sleep. Samantha was "agitated" with Robinson and the law enforcement officer and had to be reassured that they were trying to help. Robinson told Samantha to come up with a list of things she wanted to discuss and then they could go over the list in a few days to see what help could be provided to her. Samantha came up with 10 items, "anything from applying for Social Security to helping with why Medicaid was not paying for some medications to paying for a U-Haul or a storage unit to fixing a truck, finding resources for Pull-ups, electric bill," and respite. Robinson was supposed to meet with Samantha on December 4, but was unable to because Robinson's child was sick. According to Robinson, when she texted Samantha on December 5 to explain and to set up a meeting, Samantha "basically said that she felt that [Robinson] had bailed on her and that [Robinson] did not care about her and did not want to meet." Samantha never set up a time to go over the items on her list.

Sonya Oliverius is a supervisor with DHHS. She supervised the caseworker who had the "alternative response case earlier this year [2017]," and currently supervised Robinson, the current caseworker. Oliverius testified that on December 4, 2017, she received a call from Samantha; Samantha was "extremely upset" that Robinson had missed their scheduled appointment earlier that afternoon. Oliverius apologized and told Samantha that Robinson was out with a sick baby, but would contact her the following day. During her call with Oliverius, Samantha was upset about her electricity being shut off and something to do with her medications; Oliverius "offered some different things, talked to her about some different places to call," but Samantha was upset by the things she was told. Samantha also told Oliverius how "naughty Noah is, how out of control his behaviors are," and said that "Noah is constantly up her ass and she cannot get a break from him."

Oliverius contacted Samantha on December 5, 2017, because on that morning there were "multiple phone calls that Samantha had made to numerous employees through [DHHS] through different capacities" and during those calls, Samantha was "extremely volatile towards Noah." (Samantha's hearsay objection was overruled.) Oliverius started getting emails from administrators with concerns about Noah's safety. Samantha had been volatile towards the workers and was yelling and screaming at them; and one employee overheard Samantha threaten Noah that "'"if you do not get out of my room, I'm going to beat your ass."'" (Samantha's hearsay objection was overruled.) Oliverius was requested to do a safety check of Noah.

Oliverius and her administrators came up with a plan to offer respite care for Samantha with Noah, so that Samantha would be able to get a break for a few days. After they came up with the plan, Oliverius contacted Lieutenant Andrew and asked him to go with her to do a welfare check on Noah. They arrived at Samantha's residence at approximately 12:30 p.m. on December

5, 2017. Oliverius let Samantha know that they were concerned about the many phone calls made that morning and wanted to come up with a plan to get her help; this upset Samantha. When Oliverius realized Noah was home at the time, she asked Samantha why he was not at Head Start. Samantha said that Noah did not sleep the night before, that it had been a "'really rough morning,'" and that "'his behaviors were extremely hard to control.'" When Oliverius mentioned to Samantha that during the initial intake there was a concern that Samantha was giving Benadryl to Noah on a daily basis to make him go to sleep at night, Samantha started yelling and screaming. Samantha eventually agreed to allow Oliverius to walk Noah to Head Start.

When Oliverius returned to the residence, she attempted to tell Samantha of DHHS' concerns regarding the multiple phone calls made to the agency that morning, and that they would like to set up a respite plan and have her speak to a crisis counselor. Samantha eventually agreed. Oliverius also asked Samantha to "pick up the dog poop that was on the floor . . . in the entryway" and to clean up the dog's accident (it had urinated while they were there) prior to picking Noah up from Head Start. Samantha "started yelling and screaming at [Oliverius]," stating that Oliverius did not pay Samantha's bills and could not control what she does with her home. Samantha eventually agreed to clean up the mess.

Later that day, around 5 p.m., Oliverius, Lieutenant Andrew, and Officer Rucker returned to Samantha's residence because earlier in the afternoon Oliverius received many phone calls from Samantha upset about "different things" and complaining about DHHS. Samantha no longer wanted to comply with a respite plan unless Oliverius could give her a "very detailed written statement" about what was going to happen; Oliverius agreed to give a written safety plan, but Samantha did not agree with what Oliverius was going to put in the plan. Oliverius was concerned about Samantha's mental stability. (Samantha objected "on the basis of foundation for this witness to offer an opinion about someone's mental health." The court overruled the objection stating, "She's not offering an opinion on the mental health. She's giving her opinion of what caused her to take those actions.") Oliverius stated that the plan was

> to try to talk Samantha back into complying with respite and Noah going to stay somewhere else for a few days so that she could take care of the matters that she was complaining about in regards to electricity and Medicaid and medications along with us trying to get some mental health services in place for her.

When Oliverius arrived with law enforcement, Samantha was mad that they were there again and did not want to let them into her home. She eventually agreed to let Oliverius and Lieutenant Andrew come in the home, but Officer Rucker went in too. Samantha "was yelling and screaming" and would not calm down; "[s]he was scaring Noah." Noah was standing in the middle of the room and "had a look of surprise and he didn't know what was going on." He started crying at some point. Samantha "took Noah and went in between the couch and the wall." Lieutenant Andrew let Samantha know they would be removing Noah, and Samantha "started yelling and screaming, out-of-control yelling and screaming, holding onto Noah." Noah was "crying very loudly . . . over [Samantha's] yelling and screaming." Samantha would not let go of Noah, and Officer Rucker had to help get Noah. Oliverius left the residence with Noah.

Oliverius testified that at the time of Noah's removal there were "two active safety threats." She explained as follows.

The first active safety threat is [the] caregiver caused harm or made threats to cause harm to a child. This is in regards to the volatility of the phone calls that Samantha had with the multiple [D]HHS employees where she was constantly yelling and screaming profanities at Noah, where she had threatened to beat his ass if he did not leave her bedroom. This also goes with a phone call that happened with Mindy Estrada on November 29th where she told her that she could not handle Noah's behaviors and that she could probably keep both Noah and herself safe for a couple of days, but if it was longer than that, she did not believe that she could keep it a safe situation. . . .

The second safety threat is [the] caregiver cannot or will not provide for the basic needs of a child. This is in regards to supervision. Samantha has reported that Noah's behaviors are out of control and that she cannot handle him. She has told that to multiple people. She has reported that she -- that Noah has gotten out of the apartment as well and wandered in the middle of the night. She has reported that he has flooded her kitchen. . . . And then, on the 5th, I was also on the phone with Samantha, and during one of the phone calls, she had made a comment to Noah that you cannot eat medication like it's candy. This raised my red flags a lot. I questioned Samantha on it. She was very upset. She said that I was twisting her words. She then said that Noah was attempting to get into a locked medicine box with a screwdriver, which he should not have access to tools like that nor a medication box.

Samantha made no objections to Oliverius' testimony regarding the two active safety threats.

Oliverius said that Samantha had a "prior alternative response case" from January to July 2017, and that Samantha was "[n]ot fully cooperative" during that case. Intensive family preservation (IFP) had been put in the home, which "entails a therapist being in the home and trying to work with the family." But "[a]ny suggestions they ever gave were never good enough or she would not comply with anything that was ever instructed." Eventually Samantha no longer wanted the services in her home and did not agree with any of the services that were tried. The prior alternative response case was for "[a]round the same reasons why we're involved this time." "It was emotional neglect to Noah . . . yelling, threatening, screaming at him as well. There were also concerns during that case about her not understanding age-appropriate development or discipline." But now "it appears to have escalated to a point that [Oliverius] does not believe that Noah is safe in his mother's home."

Oliverius was asked if "since removal, has Noah exhibited any trauma behaviors as described by Samantha H[.] when he was living with her?" Oliverius responded, "No, nothing out of the norm of a four-year-old." Robinson, the current case worker, testified likewise. Since Noah's removal, Robinson had not observed any concerning behaviors by Noah, and the foster parents had not reported any concerning behaviors. However, Robinson said the foster father "made a comment that when Noah does get upset, once he does, he's done." And there was one incident where Noah was yelling and had a tantrum in the foster home, but it was nothing the foster parents could not handle. Robinson additionally testified that when she was taking Noah to the foster home one day, he verbalized that "his mommy spanked him sometimes with a spoon."

Robinson testified that DHHS' position is that Noah should not be placed back with Samantha "[d]ue to the instability with the parenting and instability with [Samantha] as well as Noah's behavior and his mother not being able to adequately parent him at this time."

Melissa Baez from Family Forward testified she had been supervising the visits between Noah and Samantha for 2 weeks at the time of the hearing. Baez stated,

> There's been a few concerns. Noah's aggressive with Samantha during their visits. He is very physical with Samantha by kicking her, hitting her, and punching her. When he does these things with Samantha, she gets upset sometimes and she has to leave the area where Noah is at. And there are times that she can be away for an extended period of time before she comes back into the same area where Noah is at. So, I am left with Noah while she puts herself back together.

Baez acknowledged that Noah has been violent towards her and struck her during visits as well. The guardian ad litem asked Baez how Noah reacts when Samantha gets agitated and volatile, and Baez responded that "[h]e behaves with reaction of hers," and that "they feed off of each other." Baez acknowledged that she had witnessed the "volatility" of Samantha. When asked about her "impression of that volatility," Baez said, "It was very concerning to me." (Samantha's relevance objection was overruled.) Baez also testified that Samantha "pinch[es]" Noah when he is crying and upset, because she says that he has seizures when he cries so hard and she has to prevent him from having a seizure.

Lisa Flood worked with Noah and Samantha when Flood was a family advocate for Head Start. Flood testified similarly to the other witnesses in that she said Noah would hit and kick Samantha, at which point Samantha will walk away. Flood now works for Family Forward and has supervised two visits between Samantha and Noah. The guardian ad litem asked Flood if, during those visits, there was anything concerning related to Samantha's parenting of Noah. (Samantha objected to the form of the question and objected "on foundation of this witness to offer an opinion"; the objections were overruled.) When allowed to answer, Flood responded that Samantha was "agitated" during a visit when Noah had an accident and there was not an extra pair of pants for him; Samantha got a chair, pushed it hard, and yelled at Noah to get away from her because she needed space.

### (c) Evidentiary Objections

In her brief, Samantha claims that the court erred in permitting various testimony over her objections. We address each claim in turn.

Samantha made hearsay objections to Oliverius' initial testimony that (1) there were "multiple phone calls that Samantha had made to numerous employees through [DHHS] through different capacities" and during those calls, Samantha was "extremely volatile towards Noah," and (2) Samantha had been volatile towards the workers and was yelling and screaming at them, and one employee overheard Samantha threaten Noah that ""if you do not get out of my room, I'm going to beat your ass."'" These hearsay objections were overruled. However, Oliverius testified to those same things later in regards to the two active safety threats, and Samantha did not object to that later testimony. Evidence objected to, which is substantially similar to evidence admitted

without objection, results in no prejudicial error. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999).

When Oliverius testified that she was concerned about Samantha's mental stability, Samantha objected "on the basis of foundation for this witness to offer an opinion about someone's mental health." The court overruled the objection stating, "She's not offering an opinion on the mental health. She's giving her opinion of what caused her to take those actions." We find no abuse of discretion in the court's ruling, nor did the admission of the testimony violate fundamental due process.

Samantha also claims error to the court permitting Robinson "to testify regarding comments made at the foster home supposedly by Noah," that "involved a claim that mommy spanked him sometimes with the spoon." Brief for appellant at 16. The relevant portion of the detention/placement hearing follows.

Q [guardian ad litem:] Have the foster parents made any comments that Noah has reported anything that occurred in his mom's house that caused them concern?

[Samantha's counsel]: I'll object on hearsay grounds.

THE COURT: Overruled.

[Samantha's counsel]: Also competency.

THE COURT: Overruled. You may answer.

Q [guardian ad litem:] Let me just give you a for-instance. In my experience, sometimes kiddos come out of the home where there's other stuff going on we don't know about and then say, yeah, my mommy hit me one time and this happened. Has anything like that -- has Noah ever voiced anything like that to your knowledge?

A [Robinson:] Noah's actually verbalized to me one day when I was taking him to the foster home that his mommy spanked him sometimes with a spoon. Also --

Q [guardian ad litem:] And that was to you?

A [Robinson:] Yes.

Samantha's objection at the hearing was to the question about whether the foster parents had made any comments that Noah had reported anything that occurred in Samantha's house that caused them concern. But Robinson's testimony related to what Noah told her, and Samantha did not object. See *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999) (failure to make timely objection waives right to assert prejudicial error on appeal).

Samantha claims the court erred in permitting (1) Baez to give her "opinion . . . regarding her impression of [Samantha's] 'volatility,'" brief for appellant at 16, and (2) Flood "to testify regarding 'anything concerning' she observed at the visitation involving Noah and Samantha," *id.* at 17. In her brief, Samantha claims there was insufficient foundation to establish that the witnesses had the expertise, training, and knowledge to offer such opinions. However, at the detention hearing, Samantha's objection to Baez' testimony was based on relevance, not foundation. And on appeal, a party may not assert a different ground for an objection to the admission of evidence than was offered to the trial court. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). As for Flood's testimony, she was not testifying as an expert witness, rather she was testifying as a lay witness about her own personal observations. We find no abuse of discretion in the court's ruling, nor did the admission of the testimony violate fundamental due process.

(d) Was Continued Detention Proper?

As stated earlier in this opinion, continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). In analyzing this question, the issue is whether allowing Noah to live with Samantha was contrary to his welfare; we find that it was.

Samantha called Estrada asking for services and referrals because Samantha could not handle Noah and his behaviors. Estrada asked Samantha if they were safe and if they needed help immediately; Samantha said that if she could get services within the next couple days everything would be good, but if it was going to be a week or more, then that would not work. Oliverius later contacted Samantha about respite and counseling, services Samantha initially agreed to, but then later that day refused. Samantha had been heard telling Noah she would "beat his ass," and she told multiple people that she could not handle Noah's behavior (which included him leaving the apartment at night without her knowledge) and that she needed a break. Yet when offered services to help her, she refused. The State proved by a preponderance of the evidence that reasonable efforts were made to preserve and reunify the family, but that continuation of Noah in Samantha's home would be contrary to his health, safety, or welfare. We find that the continued detention of Noah pending adjudication, and the denial of Samantha's motion for change of placement, was proper.

3. TESTIMONY BY VIDEOCONFERENCE

Samantha argues that the juvenile court erred by authorizing two witnesses to appear and testify by videoconference over her objections.

At the conclusion of the December 19, 2017, hearing on Noah's continued detention pending adjudication, the juvenile court addressed DHHS' request for two witnesses, Susan Campos and Cherri Ott, to appear at the adjudication hearing by telephone because they are "fully employed on the complete other side of the state." The court asked Samantha's counsel if he had any objection to the witnesses appearing at the adjudication by telephone, and counsel responded, "Yes, sir, we do object." The court asked DHHS if it would like to respond to Samantha's objection, and DHHS said that Samantha would not be "negatively impacted by the fact that somebody is appearing telephonically. We are able to -- I think we could probably do one of the Jabber things, if that would be appropriate if not by telephone." The court did not ask Samantha or her counsel if they would like to respond to DHHS' suggestion of allowing testimony by Jabber. Rather, the court stated, "If they do appear by Jabber, [Samantha and her counsel] will certainly have the ability to observe the witnesses as they testify. With that I'm going to overrule the objection and not allow them to appear by telephone, but they can appear by Jabber."

At the adjudication hearing, when the State called Campos as a witness, Samantha's counsel said, "I want to renew my objection to these witnesses appearing by computer, and I'd like to do that on the record." The court said, "Let's see if we can even get them. I think Ms. Campos may be coming up." Once Campos was connected, the court allowed Samantha's counsel to continue. Counsel stated,

- 10 -

I want to renew my objection I made earlier to the witness -- the Court allowing witnesses to appear by computer for the reason that neither the prosecution nor [DHHS] or the guardian ad litem has made a showing that this witness is unavailable to appear physically and why[,] to testify before this Court and [sic] this adjudication. And since the rules of evidence do apply to this adjudication, we would object to this witness testifying by computer. We believe that it interferes with my client's due process rights. So, we would object to the Court allowing this witness to appear by computer.

When asked by the court if it had a response, DHHS said,

I would again say that there is a showing of cause as to why this individual needs to appear by computer. She is more than 150 miles from Cheyenne County. In addition, there is no due process problem due to the fact that we can see her. We can hear her. He can cross-examine. So, therefore, any of the concerns that [Samantha's counsel] just stated, again, I believe, are inappropriate at this time.

The court overruled Samantha's objection, but on request allowed her a continuing objection. The hearing proceeded with Campos' testimony. At the conclusion of Campos' testimony, Samantha's counsel stated, "We want to renew our objection, move to strike all of her testimony for the reason that she did not personally appear and testify[.]" The court responded, "Overruled. There is a continuing objection. I anticipate you'll have the same objection for Ms. Ott."

When the State called Ott as a witness, Samantha's counsel stated,

Just for the record, I wanted to renew my objection prior to the adjudication regarding allowing witnesses to appear by computer. I don't think the State, [DHHS], or the guardian ad litem has made a showing that there's any sort of necessity that this witness is not available to appear and testify personally. And we believe it does violate my client's due process rights by not ordering the State to produce their witnesses live so that my client has the ability to confront them and to observe them testify in the same room with the mother. So, we would renew our objection to the witness.

The court then asked DHHS, "[S]ame response as for Ms. Campos?" And DHHS responded, "Yes, Your Honor. Except for, Your Honor, Ms. Ott is in Lincoln and not Fremont." The court overruled Samantha's objection but allowed a continuing objection. The hearing proceeded with Ott's testimony.

In her brief, Samantha argues that the juvenile court should not have permitted witness testimony by videoconferencing without the consent of all parties. We agree. Neb. Rev. Stat. § 24-734(4) (Reissue 2016) states, "A judge, in any case *with the consent of the parties*, may permit any witness who is to be examined by oral examination to appear by telephonic, videoconferencing, or similar methods, with any costs thereof to be taxed as costs." (Emphasis supplied.) Campos and Ott were witnesses who were to be examined by oral examination. Samantha repeatedly objected to allowing Campos and Ott to testify at the adjudication hearing "by computer" and not "personally appear[ing] and testify[ing]." Clearly, Samantha did not "consent" to having Campos and Ott "appear by telephonic, videoconferencing, or similar

methods," and therefore, under § 24-734(4), the juvenile court should not have allowed them to appear and testify in such a manner.

We can appreciate the argument made by DHHS in the juvenile court hearings that the two witnesses lived a long distance away from where the adjudication hearing was taking place. And we note their argument, as well as the juvenile court's finding, that by having the witnesses appear and testify by videoconference, that Samantha and her counsel would be able to see and hear the witnesses as they testified. But, as noted by Samantha in her brief,

> [Having] a witness appear on a monitor is not the same as personally appearing. Subtle cues such as a witness shifting in their chair are lost when you have a camera pointed at a witness and the witness is seated in their office. Video conferencing creates the possibility of a witness receiving instruction from other people in the room but outside the view of the camera.

Brief for appellant at 20. More importantly, § 24-734(4) does not allow for consideration of the convenience of a witness. And while videoconferencing would allow the witness to be seen and heard, the plain language of § 24-734(4) nevertheless required Samantha's consent before either witness could be allowed to appear and testify by videoconference. See *In re Interest of L.T.*, 295 Neb. 105, 886 N.W.2d 525 (2016) (language of statute is to be given its plain and ordinary meaning, and appellate court will not resort to interpretation to ascertain meaning of statutory words which are plain, direct, and unambiguous).

The juvenile court should not have allowed Campos and Ott to appear and testify by videoconference without Samantha's consent. Accordingly, on our de novo review of the record, we will not consider the testimony of Campos and Ott. See *In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985) (where review is de novo, evidence which should not have been admitted by trial court will be disregarded by reviewing court).

Because we will not consider the testimony of Campos and Ott, we need not address Samantha's other evidentiary objections made during their testimony, nor do we need to address the fact that portions of their testimony were identified as "indiscernible" in the bill of exceptions. See *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

### 4. ADJUDICATION

Samantha argues that the juvenile court erred in admitting certain evidence at the adjudication hearing and that if this evidence would have been excluded, there would not have been sufficient evidence to prove that Noah was a child as described under § 43-247(3)(a).

### (a) General Principles of Law

We begin by setting forth the general principles of law regarding adjudications.

> To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016). Section 43-247(3)(a) outlines the basis for the juvenile court's jurisdiction and grants exclusive

jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian."

The purpose of the adjudication phase is to protect the interests of the child. The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. The State must prove such allegations by a preponderance of the evidence.

*In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 845-46, 910 N.W.2d 789, 798-99 (2018). The Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). See, also, Neb. Rev. Stat. § 43-279(1) (Reissue 2016). We will note Samantha's objections at issue in the relevant portions of the witness testimony.

(b) Testimony From Adjudication Hearing

There was testimony at the adjudication hearing that Samantha had previously been involved in an alternative response case from October 2016 to January 2017. Then, in late November and early December 2017, there were concerns about Noah's safety that ultimately lead to his removal. In both instances, Samantha struggled with Noah's behaviors, sought help, but then resisted services. We begin with the testimony about the previous alternative response case, and then continue with the testimony about the more recent concerns regarding Noah's safety.

*(i) Testimony About Previous Alternative Response Case*

Stephanie Hoover, a children and family services specialist with DHHS, testified that she had an alternative response case with Samantha from late October 2016 to January 2017; it transitioned to a noncourt case "right at the end" of the case. A case goes from an alternative response case to a noncourt case when there is a possibility of some concern about safety and they come up with a case plan and "work services with the family to try to keep the child in the home." In October 2016, Samantha identified that she needed help with her son and some other services. Samantha was working on getting her son into counseling, but his behaviors were too much for her at times, so she wanted respite as well. She wanted in-home therapy and an evaluation of Noah. During a conversation in November, Samantha was "frustrated, exhausted," and in a text message said, "'I'm going to need respite soon or I am going to beat his ass.'" In January 2017, Hoover discharged Samantha from the non-court case because Samantha asked for the case to be closed; at that point, DHHS had identified concerns, but not a safety threat, so it did not file a request for the juvenile court to get involved. DHHS was concerned because Samantha was inconsistent at times and struggled to provide a routine for Noah. However, Noah was not reacting to Samantha's demeanor at that point; he was not upset or fearful. And at the time, respite was set up, Samantha was getting counseling, and she was providing for Noah's needs.

Sandra Raney was the IFP therapist for Samantha from December 12, 2016, to January 9, 2017; Raney subcontracted through Paradigm. Raney testified that IFP means that a counselor and a skill builder are in the home of a client 8 to 10 hours a week to provide therapy to the family,

build social skills, and build family skills. Raney went to Samantha's home three times a week, and the skill builder was in the home two to three times each week. Raney had a total of six visits with Samantha; other visits were missed because of weather and Samantha would not reschedule. During services, Samantha was "argumentative and resistant," even when being given a compliment. When Raney tried to have a conversation with Samantha about Circle of Security, an attachment based program, Samantha "shut [Raney] down." "[Samantha] knew all that from Nevada and she was very frustrated that her son was not following what she felt was an appropriate parenting protocol"; Samantha "kept putting all the blame to Noah and his mental health." Samantha refused to complete Circle of Security. And during meetings, Samantha would scream and yell at Raney and at Noah. (Samantha's foundation objection was overruled.) Raney said "[t]here was obviously a personality conflict between myself and Samantha, personality conflict between Samantha and my family skill builder." The last time Raney and a DHHS worker attempted to meet with Samantha to resolve whatever issues were going on, "all [Samantha] did was holler and berate. She would not even have a conversation with us." Raney stated that exhibit 4 is the discharge report, "the Summaries of Activities Report that we complete every week for DHHS"; Raney drafted the document. (Samantha's hearsay objection to exhibit 4 was overruled.)

Colleen Shoemaker previously worked as a family advocate at Speak Out and worked with Samantha from December 2016 until February or March 2017. Shoemaker said there were some conflicts between Samantha and Raney, because Samantha wanted someone to watch her interaction with Noah before determining what kind of program to institute, but Raney said no because there was a certain way of doing things. Samantha would "vent" and become emotional when talking about DHHS; she would "talk tersely, and her voice would go up, but it wasn't a yell, about how she felt they were treating her."

Shoemaker was in Samantha's apartment four to six times each month and had the opportunity to observe Noah and Samantha interact. Samantha and Noah "definitely love each other," but "Samantha would be sometimes irritated at him. But then again, Noah, watching him, he was like a whirlwind." "There were many times that I walked in, the house was, you know, relatively picked up," "[b]ut within five minutes of walking in their house, he would have the place almost pulled apart." Most of the time Noah's behavior was standard for a child his age, but one time Shoemaker and Samantha heard a cat meowing and they "didn't realize he had put the cat in the refrigerator"; Shoemaker had never seen a toddler do that. When asked if she ever saw any sort of physical, mental or emotional, or sexual abuse, or any sort of unexplained bruises or injuries, Shoemaker responded, "Absolutely not." From her observations, it appeared to Shoemaker that Samantha knew how to parent, and she asked for tips to try and handle Noah when Noah had issues.

*(ii) Testimony About Current Concerns*
*Regarding Noah's Safety*

Estrada's and Robinson's testimony was similar to their testimony at the detention/placement hearing, which we have described in detail previously. At the adjudication hearing, Robinson also testified that during an investigation, DHHS typically does two assessments: a safety assessment to see if the child is safe immediately, and then a risk assessment. Part of the risk assessment is to look at past history, including in other states. According to

Robinson, Samantha and Noah had a history in Nevada. Robinson said that the Nevada records commented that Noah had been evaluated, but no evaluations were attached to the record, and the Nevada records also noted that Samantha indicated to the "CPS" worker that she was subject to domestic violence. (Robinson did not indicate the date of the Nevada records, and those records were not offered or received into evidence at the adjudication hearing). Robinson said that there was a previous alternative response case (a type of voluntary case) in Nebraska between 2016 and 2017. During that time, IFP was put into the home.

Oliverius also testified similarly to her testimony at the detention/placement hearing, which we have detailed previously. She also noted that there had been an alternative response case open from June 2016 to February 2017 because Samantha could not handle Noah. Samantha was provided IFP and family support. The 10-week IFP program ended unsuccessfully. The concerns from the alternative response case are similar to the concerns in the current case, but they have "very much so escalated since [the alternative response case]." Oliverius testified that at the time of Noah's removal in December 2017, there were two active safety threats and DHHS did not believe that Noah was safe in the home. As noted previously, Oliverius stated that the first safety threat "is in regards to [the] caregiver causing harm or making threats to cause harm to a child." "The safety threat is active due to the threat that Samantha made to her child while she was on the phone with Cheri Ott, along with her being extremely volatile during other conversations with individuals where she is yelling and screaming at Noah and her constantly saying she cannot handle his behaviors." (Samantha objected on foundation, stating that "[t]here's insufficient foundation for this witness to offer that opinion as to who [Samantha] was talking to on the phone"; the objection was overruled.) Oliverius then addressed the second safety threat that the "caregiver cannot or will not meet the needs of the child"; "[t]his is based mostly on supervision." "Samantha has reported that she cannot handle Noah's behaviors. She has reported he has gone out of the apartment in the middle of the night. She has reported that he has flooded the kitchen on multiple occasions." Samantha stated she cannot handle Noah's behaviors, yet she will not follow through on services provided.

Oliverius was asked how Samantha's behavior compared to that of other parents Oliverius had met or investigated. (Samantha relevance objection was overruled.) Oliverius responded that Samantha's behavior "was harsh and much more escalated that I have ever had to deal with in the past." After describing how Samantha behaved when law enforcement told Samantha they were going to remove Noah on December 5, 2017--Samantha was "out-of-control" yelling and screaming, holding onto Noah, Noah crying loudly--Oliverius was asked if, in her experience watching removals, if she had had an experience where a parent has acted to that extreme. (Samantha's relevance objection was overruled.) Oliverius responded, "I have not, in my five and a half years with the Department and the removals that I've known, this removal was the most traumatic for myself, and I cannot imagine what it was like for a four-year-old." Oliverius was then asked if she thought it was traumatic because of how the officers behaved or because of how Samantha reacted. (The court overruled Samantha's relevance and foundation objections stating, "based on her observations and experience, she may answer to that limited purpose.") Oliverius responded, "I think for myself, it was the entire situation. Her behavior is what led the officers to have to get that child out of that situation."

Aaron Rucker, an officer with the Sidney Police Department, was called as a witness on behalf of Samantha. Officer Rucker assisted with the followup welfare check at Samantha's residence on December 5, 2017, at approximately 5 p.m., and said at that point, Oliverius and Lieutenant Andrew were stating that they were going to remove Noah from the house. When Samantha opened the door, she asked, "'When will you guys leave me alone?'" Lieutenant Andrew asked if they could come in and speak to Samantha, and Samantha agreed, as long as it was only one officer; but Lieutenant Andrew, Officer Rucker, and Oliverius all entered the residence. At that point, Samantha picked Noah up, and after Lieutenant Andrew told Samantha that they would need to remove Noah from her custody, Samantha "got emotional, latched onto the child, backed into a corner." "At that time, there was a lot of screaming, yelling, and then Lieutenant Andrew moved forward to try to remove the child from her grasp. She backed further into the corner between a couch and a corner wall . . . and started crouching down"; Noah was screaming and crying. Officer Rucker "reached in, got a hold of Noah, pulled him away, and handed him off to [Oliverius]," who removed him and put him in Lieutenant Andrew's car. Samantha was handcuffed and placed in Officer Rucker's vehicle. Exhibit 7 is Officer Rucker's in-car video recording of the removal.

Since the removal, Robinson has had face-to-face contact with Noah almost weekly; she has not witnessed any out-of-control behaviors or anything that made her concerned about his mental health. Samantha did not tell Robinson that Noah had been diagnosed with any mental health issues, but Robinson "found that out later on through reviewing records." Samantha did tell Robinson that she was on Adderall, but did not say why she was taking the medication.

Flood testified that she was currently employed as a family support worker with Family Forward. She supervised a visit between Samantha and Noah on December 8, 2017. The State asked Flood if, during that visit, she had any concerns with respect to Samantha's parenting of Noah. (Samantha objected, stating, "[R]elevance. Beyond the scope of this witness's ability to offer an opinion. She's not competent." The court overruled the objection, and allowed Flood to answer.) Flood stated that during that visit, Samantha took Noah to the doctor because he had not been feeling well, Samantha "did a really good job of being protective of Noah and parenting him that day." Flood was then asked if there was something concerning about the visit she was present for the following week in December. (Samantha again objected on relevance and said Flood was not competent to offer an opinion. The objection was overruled, and Flood was allowed to answer.) Flood said she was present during a visit the following week, and Samantha got frustrated with Noah when he did not take redirection. When Samantha gets frustrated, sometimes she will take deep breaths or mumble under her breath, and sometimes she will go to another room. That day, Samantha "slammed" a chair down and had to walk into another room. Noah "seems to feed off of [Samantha's] behavior at the same time and will start getting agitated as well." And when Noah gets agitated he "throws things or hits at" Samantha; Flood had not seen Noah do that with anybody else in the room, just with Samantha.

Baez testified she works with Samantha 5 days each week for supervised visits, and has been working with her on some family support as well; she began supervising Samantha's visits in the beginning of December 2017. During a visit on December 13, Samantha "became frustrated" when Noah had an accident and she did not have a change of clothes; later she would not engage with Noah and told him she needed to "'take space'" and he needed to stop (that was also the visit

where Samantha "slammed" a chair down in frustration). Baez was asked by the State to describe any concerns she had about Samantha's interactions with Noah that she observed during the supervised visits. Baez said that at the early visitations, there were "several concerns with the inability of [Samantha] to pull herself back together when frustrated, and . . . specifically where Noah was at, raising her tone with Noah or not engaging with Noah when she was frustrated and telling him to leave her alone." But, Baez said for "[t]he last week, she has done well during her visits, except for the last visit." During the last visit, Samantha was frustrated because Baez prompted her to engage with Noah and play with him as she had done when visits took place at the office because her progress seemed to end since they made it to home visits. Samantha got very angry with Baez and yelled at her, and Baez had to tell Samantha to lower her tone. Samantha stepped outside to gather herself. Baez said, "Noah then yelled at me and hit me, and told me he was mad at me, his mom was mad at me, and his dog was mad at me." Noah becomes frustrated when Samantha is frustrated. When Samantha is frustrated she will take deep breaths, leave the area, or scream at Baez; she will also yell at Noah.

Baez was asked if, in her opinion, there had been concerns regarding what was appropriate, to which Baez responded, "Yes." Baez was asked if she believed "just in [her] experience with [Samantha], that [Samantha] understands the limitations of a four-year-old?" (Samantha objected citing "insufficient foundation for this witness to offer that opinion, and relevance." The court said, "Limiting it to this witness's training and experience and knowledge and observations, she may answer to that.") Baez said, "[Samantha] believes, from what she has said to me, that Noah understands delayed consequences. . . . And, at one point, stated that he will remind her that he was punished the day prior."

Baez further testified that Samantha said she had trauma in her childhood. Samantha also said that she had a boyfriend who was abusive and that she came "here" to get away from him. Samantha told Baez that Noah needs "trauma and (indiscernible) care because of the trauma he has experienced in his life."

(c) Evidentiary Rulings

In her brief, Samantha claims that the court erred in permitting various testimony over her objections. We have already determined that the testimony of Campos and Ott should not have been allowed because Samantha did not consent to those witnesses appearing and testifying via videoconference. Accordingly, on our de novo review of the record, we will not consider the testimony of Campos and Ott.

Samantha also contends that the juvenile court made various other evidentiary errors. We briefly address each in turn. We note that the State did not address Samantha's evidentiary claims in its brief.

Samantha claims the court erred in allowing Raney to testify that during meetings, Samantha would scream and yell at Raney and Noah. Samantha claims "there was no foundation for when this occurred." Brief for appellant at 26. However, Raney testified that she worked with Samantha from December 12, 2016, to January 9, 2017. Because a sufficient time frame was established, we find that the juvenile court did not abuse its discretion in overruling Samantha's foundation objection.

Samantha claims the court erred in admitting exhibit 4 into evidence because "[a] quick examination of the nine pages of Exhibit No. 4 shows that it contains numerous items of hearsay information," and "[t]here are a number of entries of information from various sources." Brief for appellant at 22. Exhibit 4 is a discharge report containing a summary of activities provided by Paradigm; Raney testified that she drafted the document. Exhibit 4 does appear to contain some hearsay statements. Regardless, in a trial to the court, the presumption is that the trial court considered only such evidence as is competent and relevant, and the reviewing court will not reverse such a case because evidence was erroneously admitted where there is other material, competent, and relevant evidence sufficient to sustain the judgment. *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999). See, also, *In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985). "In addition, and perchance most importantly, where the review is de novo, evidence which should not have been admitted by the trial court will be disregarded by the reviewing court." *In re Interest of S.S.L.*, 219 Neb. at 917, 367 N.W.2d at 715. In our de novo review of the record, we will not consider the hearsay portions of exhibit 4; in fact, our ultimate decision in this case is not based on exhibit 4 at all.

Samantha claims that the court erred in allowing Oliverius to testify regarding information from Cheri Ott as a basis for finding a safety threat. Oliverius testified, "The safety threat is active due to the threat that Samantha made to her child while she was on the phone with Cheri Ott, along with her being extremely volatile during other conversations with individuals where she is yelling and screaming at Noah and her constantly saying she cannot handle his behaviors." Samantha objected on foundation, stating "[t]here's insufficient foundation for this witness to offer that opinion as to who [Samantha] was talking to on the phone." The objection was overruled. We agree that there was no foundation given for who Samantha was talking to on the phone. Therefore, we will not consider that portion of Oliverius' testimony in our de novo review. See, *In re Interest of Kelley D. & Heather D., supra*; *In re Interest of S.S.L., supra*.

Samantha claims that the court erred in allowing Oliverius to testify as to (1) how Samantha's behavior compared to that of other parents Oliverius had met or investigated and (2) whether Oliverius thought the removal was traumatic to Noah because of how the officers behaved or because of how Samantha reacted. Samantha argues that the testimony was irrelevant, and that there was insufficient foundation upon which Oliverius could offer an opinion as to the cause of the trauma. First, Oliverius was not testifying as an expert witness, but was testifying as a lay witness as to her own opinions and observations. However, even if we assume that both portions of Oliverius' testimony were irrelevant, we have reviewed the other evidence de novo on the record and find that it is sufficient to support the juvenile court's order. See, *In re Interest of Kelley D. & Heather D., supra*; *In re Interest of S.S.L., supra*.

Samantha again claims that the court erred in permitting Flood to testify as to her concerns about Samantha's parenting of Noah. She claims "the concerns of this family support worker are not relevant without some foundation regarding the witness's training and knowledge to offer such an opinion." Brief for appellant at 24. The citation to the record provided in Samantha's brief goes to the testimony and objection from the visit on December 8, 2017, the visitation for which Flood's testimony was favorable to Samantha; thus, we are unclear as to why Samantha is challenging that ruling. Regardless, Flood was not testifying as an expert witness, rather she was testifying as a lay

witness about her own personal observations and concerns. We find no abuse of discretion in the court's ruling.

Samantha claims that the court erred in permitting Baez to testify regarding her opinion that Samantha does not understand the limitations of a 4-year-old because there was no evidence that Baez was competent to offer such an opinion. The court specifically said, "Limiting it to this witness's training and experience and knowledge and observations, she may answer[.]" Like Flood, Baez was not testifying as an expert witness, rather she was testifying as a lay witness about her own personal observations and concerns. We find no abuse of discretion in the court's ruling.

### (d) Sufficiency of Evidence for Adjudication

As stated earlier in this opinion, to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). And while the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id*. In the instant case, the State alleged that Noah was a child within the meaning of § 43-247(3)(a) for the reason that he "is in a situation injurious to the health or morals of such juvenile." The State further alleged that Samantha "has expressed frustration that she is having difficulty parenting [Noah]."

Samantha was involved in a previous alternative response case (late October 2016 to January 2017) in which she sought help because of Noah's behaviors. She was not cooperative with the services provided to her at that time and ultimately asked for the case to end, which it did (and without court involvement).

However, less than 1 year later, in late November and early December 2017, Samantha was seeking services because she could not handle Noah's behaviors and could not control him. She often yells and screams at those trying to assist her, as well as expresses frustration towards Noah. When Estrada asked Samantha if she and Noah were safe and if they needed help immediately, Samantha said that if it was a couple days until she got some help from services, it would be okay, but that if it was a couple weeks or months, she would not be able to handle him at that time. Oliverius later contacted Samantha about respite and counseling, services Samantha initially agreed to, but then later that day refused. Samantha has told more than one person that she cannot handle Noah's behaviors (which include him leaving the apartment at night) and that she needed a break. Yet when offered services to help her, she refused. Based on our de novo review of the record, we find by a preponderance of the evidence that Noah was a child within the meaning of § 43-247(3)(a).

### VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's December 19, 2017, order which continued the detention of Noah pending adjudication. And although we find that the court (1) should not have allowed two witnesses to testify by videoconference at the adjudication hearing without Samantha's consent and (2) should not have allowed some evidence over Samantha's objections, our de novo review of the record nevertheless leads us to find that there was other

sufficient evidence to adjudicate Noah pursuant to § 43-247(3)(a). We therefore also affirm the January 17, 2018, adjudication order.

AFFIRMED.